UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| R. DAVID BOYER, Trustee, | ) |
| | ) |
| Plaintiff-Appellee | ) |
| | ) |
| v. | ) No. 1:06-CV-409RM |
| | ) |
| CROWN STOCK DISTRIBUTION, INC., | ) Appeal from the United States |
| STEVEN STROUP, II, STEVEN STROUP, SR., | ) Bankruptcy Court Northern |
| STEVEN STROUP II REVOCABLE TRUST, | ) District of Indiana, |
| LAURIE B. STROUP, LAURIE B. STROUP | ) Ft. Wayne Division |
| REVOCABLE TRUST, LORETTA J. STROUP, | ) No. 04-0185 |
| CLAYBURN E. STROUP and DONALD | ) |
| HOUSEWORTH, | ) |
| | ) |
| Defendants-Appellants. | ) |

OPINION AND ORDER

This appeal arises from the bankruptcy trustee's adversary proceeding asserting state law fraudulent transfer claims against defendants Crown Stock Distribution, Inc. and shareholders, in which the trustee sought to recover a $3.3 million transfer from debtor Crown Unlimited Machine, Inc. to defendants for the sale of Crown Stock's assets, and an additional $590,000 that Crown Stock distributed to its shareholders around the time of the sale. The appellants Crown Stock, Steven Stroup Sr., Loretta Stroup, Clayburn Stroup, and Donald Houseworth[1] appeal the bankruptcy court's decision avoiding the transaction as fraudulent and ordering the defendants to return the value of property transferred. The trustee cross appeals, contending that the bankruptcy court

---

[1]During briefing in this matter, defendants Steven L. Stroup II and Laurie B. Stroup dismissed their appeal and the trustee dismissed his cross appeal against them.

should have construed the sale as a leveraged buyout and entered additional judgment in his favor for the dividend distribution. The issues before the court involve application of Indiana law as asserted through the powers the trustee has been given by § 544(b) of the United States Bankruptcy Code. 11 U.S.C. § 544(b).

The trustee has requested a hearing, but setting a hearing would only further delay an appeal that has awaited resolution far too long. The court can offer no justification for the delay, because nothing can justify so great a delay. The court can offer only its regrets and apologies. In any event, for the following reasons, the court denies the trustee's request for hearing, denies the defendants' appeal and denies the trustee's cross appeal. The bankruptcy court's decision is affirmed.

## I. FACTS

Trustee David Boyer instituted two state law fraudulent transfer claims against Crown Stock Distribution, Inc. and its shareholders pursuant to § 544 of the Bankruptcy Code. 11 U.S.C. § 544. After a nine-day trial, the bankruptcy court entered judgment for the trustee and against Crown Stock and its shareholders in the combined amount of $3,295,000.

Before January 2000, Crown Stock Distribution was known as Crown Unlimited Machine, Inc. Steven Stroup Sr. owned Crown Stock Distribution until he sold the company to his son Steven Stroup II in 1988. In December 1999, the following individuals had an ownership interest in Crown Stock: Steven Stroup II -

51%; Laurie Stroup - 26%; Loretta Stroup - 5%; Steven Stroup Sr. - 5%; Donald Houseworth - 10%, Mark Wenger - 2%, and Clayburn Stroup - 1%. Steven Stroup II was President, Steven Stroup Sr. was Chief Executive Officer, and Laurie Stroup was Secretary and Treasurer; all three, plus Loretta Stroup served on Crown Unlimited's Board of Directors. Crown Stock's primary business was designing and manufacturing tube bending and cutting machinery. Crown Stock was a profitable business; in 1999 the company had net income of $1,188,770, in 1998 it had net income of $539,388,[2] and in 1997 it had net income of $755,960. Crown Stock was averaging about fifteen percent yearly increase in sales.

Mr. Stroup Sr. met Kevin E. Smith at a trade show in 1998. Mr. Smith was president of Wauseon Machine, Inc., an industry similar to Crown Stock. Mr. Stroup Sr. and Mr. Smith had several discussions in the following months; their shared religious conviction was the primary focus of their initial conversations. When Mr. Smith indicated his desire to purchase Crown Stock, Mr. Stroup Sr. referred him to his son. Mr. Smith and Mr. Stroup II met a few times to discuss the sale and Mr. Smith began performing due diligence. His accountant reviewed the company's books and records, formulating a valuation of the company in a range of $2.7 to $3 million as a going concern. In evaluating the sale, Mr. Smith's accountant questioned the company's viability at a purchase price greater than

---

[2] The defendants point out that the net income in 1998 didn't include two machines with a total purchase price of $850,000; the machines were completed in 1998 but not counted as income because they weren't shipped until 2000.

$6 million. Mr. Smith made Mr. Stroup II an offer of $2.4 million for the company. Mr. Stroup II refused the offer and countered at $6 million. Mr. Smith accepted.

After discussing the matter with his attorney, Mr. Smith decided to purchase Crown Stock's assets, rather than its shares, to avoid assuming all of Crown Stock's liabilities. The parties entered into an "Agreement to Agree" in January 1999, in which Mr. Smith agreed to pay $3.1 million of the purchase price upon the scheduled April 1, 2000 closing, and the remaining $2.9 million pursuant to a promissory note, bearing interest at eight percent, payable to Crown Stock. Mr. Smith needed financing to purchase Crown Stock's assets; his personal financial sheet, reviewed by Mr. Stroup II, showed that he had a net worth of $397,000. The agreement also provided that Mr. Smith could work at Crown Stock until closing so that he could perform additional due diligence and arrange for financing. Pursuant to the agreement, Mr. Smith's obligation to complete the purchase was conditioned upon his reasonable satisfaction of a due diligence analysis of Crown Stock. Before signing the Agreement to Agree, Mr. Smith reviewed Crown Stock's financial records, including income statements and tax returns.

Mr. Smith started working at Crown Stock full time in late spring 1999. Crown Stock's manufacturing process became more efficient and sales increased during his employment. Continuing with due diligence, Mr. Smith's accountant informed Mr. Smith of his concern with the company's lack of working capital and advised Mr. Smith to ask Crown Stock to transfer more cash at closing or consider

backing out of the deal. Instead of backing out, though, Mr. Smith asked that the closing be advanced to January 2000 because a large shipment of equipment was scheduled to be sent out at the beginning of 2000.

Mr. Smith and his accountant received all the financial information they requested before the closing and performed further due diligence determining worst case scenarios and projections. Mr. Smith concluded that he could use the assets to operate a company similar to Crown Stock and be more profitable, while servicing its debts. No individuals associated with Crown Stock were involved in creating, or even saw, these feasibility reports.

In December 1999, Mr. Smith formed Kevin E. Smith Enterprises, Inc. (the debtor), with a personal investment of $500, as the acquisition vehicle for Crown Unlimited. Crown Stock and Smith Enterprises, through counsel, entered into a definite agreement for the purchase of Crown Stock's assets. Mr. Smith obtained the right to use the name Crown Unlimited Machine, Inc., agreed to purchase Crown Stock's personal property (equipment, inventory, accounts receivable, cash, bank accounts, work-in-process for existing customers, customer lists, intellectual property, trade secrets, etc.) for $4.5 million and real property for $1.5 million, and agreed to assume certain liabilities of approximately $1.5 million. Before closing, Crown Unlimited's equipment was appraised at $406,185, and its real estate was appraised at $1.5 million. Experts for both sides testified at trial as to the company's value and "depending on which expert was testifying, the value . . . was anywhere from $3 million to $7 million." (Bankr. Court's Decision dated

October 13, 2006, p. 13). There was also evidence that the company had been valued at $2.8 million for 1998. Based on the evidence presented at trial, the bankruptcy court found that the value could not have exceeded $4 million.

The parties closed on January 5, 2000; Mr. Stroup II was the only Crown Stock shareholder at the closing. Farmer and Merchants State Bank provided Smith Enterprises with a $3.1 million loan secured by a first lien on all of Crown Unlimited's assets. Mr. Smith executed the $2.9 million promissory note payable to Crown Stock secured by a second lien on all of Crown Unlimited's assets. The note provided that no payments had to be made until April 2001, with yearly payments to be made until April 2006, when the note would mature. The amount of payments under the note were based on the debtor's performance in the prior year with minimum annual payments of $100,000. Because the eight percent interest on the note amounted to $232,000 per year, the minimum payments created negative amortization.

Crown Stock used the sale proceeds to pay some corporate expenses and distributed the remaining proceeds to the shareholders as follows: Mr. Stroup II ($1,555,500), Laurie Stroup ($793,000), Mr. Stroup Sr. ($152,500), Loretta Stroup ($152,500), Clayburn Stroup ($30,500), Donald Houseworth ($305,000) and Mark Wenger ($61,000). The shareholders paid taxes on the proceeds. Near the time of the sale, Crown Unlimited transferred another $590,328 to a separate bank account to be distributed to the shareholders as a dividend. Pursuant to the terms of the parties' transaction, this dividend was an overpayment of $337,336. In April

2000, an outside accountant to Crown Stock advised Mr. Stroup II of this discrepancy and suggested that the shareholders remit this amount to Crown Unlimited; Mr. Stroup II never corrected the discrepancy.

Crown Stock was Crown Unlimited Machine, Inc. before it sold its name and became Crown Stock Distribution, Inc. After closing, Smith Enterprises changed its name to Crown Unlimited Machine, Inc. Mr. Smith was carrying on business as a going concern. No notice of the transaction was sent to Crown Stock's trade creditors. At closing, Mr. Stroup II and Mr. Stroup Sr. signed agreements not to compete with Crown Unlimited. Mr. Smith believed that he could operate the company profitably even with the debt that the company incurred. Crown Unlimited's financial statement prepared on December 31, 1999, listed total assets at $3,750,609 and total liabilities at $1,780,935. After the sale, Crown Unlimited had total debts of $7,504,878 and $811,000 in its bank account to maintain operations. The amount of available capital didn't cover the company's existing trade debt or customer deposit liability, which amounted to $1.5 million, but Crown Unlimited was able to pay the liabilities assumed from Crown Stock within a few months of closing. The company had annual debt service obligations to F&M of approximately $495,000 and minimum annual payments of $100,000 on the promissory note. After three and half years of operation, Crown Unlimited filed bankruptcy.

There was evidence that the way Mr. Smith ran Crown Unlimited was more costly than how Mr. Stroup II ran the company. Mr. Smith began honoring

warranty claims arising from expedited shipments in 1999, even though he hadn't assumed those warranties and Crown Stock was still liable for them. This warranty servicing cost Crown Unlimited $82,000 in 2000. Crown Unlimited also began implementing a customer service program that was more costly than Crown Stock's program. Crown Unlimited began to spend more money on business expenses and capital expenditures, such as cars, office furniture and computers. Although Crown Unlimited realized that it needed a line of credit in early 2000 to cover cash flow deficiencies, it didn't obtain that line of credit for over a year.

Mr. Smith also focused Crown Unlimited's business in a different direction. In 2000, Mr. Smith decided to standardized Crown Unlimited's machinery and began carrying a high percentage of standardized "round tube" inventory, despite his accountant's warnings that doing so was a mistake. While Crown Stock was one of only three custom manufacturers in the industry, Crown Unlimited immediately faced competition from hundreds of companies in the standardized tube bending and cutting industry.

Crown Unlimited kept borrowing money to run the business. In July 2000, it borrowed $125,000 from F&M to buy computer equipment deemed important to operations. Mr. Smith loaned Crown Unlimited $100,000 to maintain operations in 2000 and Mr. Smith's accountant loaned the company $49,000 in 2001. In March 2001, Crown Unlimited requested a $500,000 line of credit from F&M, and received it in April 2001. By May 2001, Crown Unlimited had borrowed $400,000 on the new line of credit. That same month, Crown Unlimited began

laying off employees due to its poor financial performance. In July 2001, Crown Unlimited arranged with F&M to defer payments on its loan and it negotiated with vendors to extend payment terms. In 2002, Mr. Stroup Sr. loaned Crown Unlimited another $50,000. Crown Unlimited failed to remit employment withholding taxes to the IRS ($280,758.27) and Indiana Department of Revenue ($143,712.35) from 2000 through 2003.

Unlike its predecessor, Crown Unlimited wasn't profitable. There was evidence that Crown Unlimited had received fewer orders than expected and that 9/11 had a negative impact on Crown Unlimited's performance. In 2000, Crown Unlimited posted net losses of $464,165,[3] in 2001 it posted net losses of $914,567, and in 2002 it posted net losses of $1,512,501.[4] Despite this performance, Crown Unlimited made its $100,000 minimum payments on the promissory note in April 2001 and 2002. Crown Stock distributed the payments in proportion to each shareholder's ownership interest, after payment of expenses. Mr. Smith tried to renegotiate the terms of the note after the 2002 payment, but the parties couldn't reach an agreement and Crown Unlimited missed the third payment in April 2003. As a result, Crown Stock commenced a receivership action against Crown Unlimited and shortly thereafter, Crown Unlimited filed Chapter

---

[3]This amount reflects amortization, depreciation, and unusual items that wouldn't reoccur in later yeas; without taking these into consideration, Crown Unlimited had a net operating profit of $163,520.00.

[4]These figures also include amortization and depreciation; excluding these, the loss was $552,403 in 2001 and $1,150,338 in 2002.

11 bankruptcy on July 28, 2003. The case was subsequently converted to a Chapter 7.

Within its bankruptcy case, Crown Unlimited petitioned the bankruptcy court to authorize the sale of its assets. The court approved the sale over Crown Stock's objection and the assets eventually were sold to Crown Acquisition, LLC for $3.7 million. F&M financed the asset sale from the debtor's bankruptcy estate with a new loan that Mr. Smith guaranteed. Mr. Smith is now President of Crown Acquisition, doing business as Crown Unlimited Machine, Inc.


## II. STANDARD OF REVIEW

A bankruptcy court's legal conclusions are reviewed *de novo*, and its findings of fact may only be set aside if they are found to be clearly erroneous. Freeland v. Enodis Corp., 540 F.3d 721, 729 (7th Cir. 2008); In re Heartland Steel, Inc., 389 F.3d 741, 743-744 (7th Cir. 2004). Review under the clearly erroneous standard is "significantly deferential." Concrete Pipe and Products of California, Inc. v. Constr. Laborers Pension Trust for S. California, 508 U.S. 602, 623 (1993). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (*quoting* United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). "If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirely, [the court] will not reverse its factual

findings even if [the court] would have weighed the evidence differently." <u>Freeland v. Enodis Corp.</u>, 540 F.3d at 729 (*quoting* <u>In re Lifschultz Fast Freight</u>, 132 F.3d 339, 343 (7th Cir. 1997)) (internal quotations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." <u>Anderson v. City of Bessemer City</u>, 470 U.S. at 574. "Mixed questions of law and fact are subject to de novo review." <u>Freeland v. Enodis Corp.</u>, 540 F.3d at 729 (*citing* <u>Mungo v. Taylor</u>, 355 F.3d 969, 974 (7th Cir. 2004)).

## III. Discussion

The trustee sought to avoid the following transfers pursuant to Indiana's version of the Uniform Fraudulent Transfer Act, IND. CODE § 32-18-2 *et seq.*:[5] (1) the $3.1 million cash portion of the purchase price transferred upon closing; (2) the $200,000 payments on the promissory note made in April 2001 and April 2002; and (3) the $590,328 dividend transferred by Crown Stock to its shareholders. The trustee's theory at trial was that the January 2000 transaction was a leveraged buyout in which the debtor Crown Unlimited received no value. The trustee maintained that the transaction should be collapsed and as a result, all transfers, including the dividend, should be avoided. The bankruptcy court rejected the trustee's leveraged buyout theory, but found that the transfer of the $3.1 million and $200,000 were fraudulent conveyances and awarded judgment

---

[5]Much of the UFTA has been derived from the Bankruptcy Code's provisions concerning fraudulent transfers and as a result, in the absence of decisions from Indiana's courts, this court can look to bankruptcy decisions for guidance.

to the trustee for $3,295,000 million.[6] The bankruptcy court found against the trustee on his $590,328 dividend claim. Appellants appeal on the avoidance and liability issues. The trustee cross appeals on the court's rejection of his LBO theory.

Under § 544(b)(1) of the Bankruptcy Code the trustee can "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable . . . ." 11 U.S.C. § 544(b)(1). This provision allows the trustee to take advantage of state law concerning fraudulent conveyance. In re Xonics Photochem., Inc., 841 F.2d 198, 202 (7th Cir. 1998). The result is that "if any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee can use § 544(b) to obtain that asset for the estate. As part of the estate, the asset is then divided among all the unsecured creditors . . ." In re Leonard, 125 F.3d 543, 544 (7th Cir. 1997).

Indiana law recognizes two different types of fraudulent conveyances. Indiana Code § 32-18-2-14 (§ 14) applies to a creditor whose claim arose before or after the transfer and states:

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose either before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .

---

[6]Shareholder Mark Wenger settled with the trustee for $5,000, reducing the trustee's judgment by that amount.

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>> (A) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>> (B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

Indiana Code § 32-18-2-15 (§ 15) provides a similar claim, but only applies if there is a creditor whose claim arose before the transfer, and:

> (1) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and
> (2) The debtor:
>> (A)    was insolvent at that time; or
>> (B)    became insolvent as a result of the transfer or obligation.

The trustee's claim was based upon both of these provisions and the burden of establishing their conditions rested with him. In re Morris Commc'n NC, Inc., 914 F.2d 458, 466 (4th Cir. 1990).

Affirmative defenses are available to certain transferees. A trustee can't recover from a subsequent transferee who "takes for value . . . in good faith, and without knowledge of the voidability of the transfer avoided . . ." 11 U.S.C. § 550(b)(1). The transferee bears the burden to establish a good faith transferee for value defense. See Leonard v. Mountainwest Fin. Corp. (In re Whaley), 229 B.R. 767, 776 (Bkrtcy. D. Minn. 1999).


*A. Appellants' Motion to Strike*

The appellants argue that Sections III and VI of the trustee's reply and sur-reply should be stricken. The appellants contend that the trustee's arguments of actual fraud in Section III should be stricken because the trustee didn't assert that actual fraud occurred in his initial brief in support of his cross-appeal. The court agrees. "[A]rguments for reversal cannot be withheld until a reply brief, because the appellee then has no chance to respond to them." <u>Sledd v. Lindsay</u>, 102 F.3d 282, 285 (7th Cir. 1996). The bankruptcy court made no findings as to actual fraud and the issue wasn't raised in the trustee's initial brief. The court strikes Section III to the extent the trustee argues that actual fraud was present in the January 2000 transaction.

The appellants next ask the court to strike Section VI of the trustee's reply addressing the trustee's valuation evidence. They contend that this issue doesn't relate to the trustee's cross-appeal, but instead relates to appeal issues the appellants raised. Bankruptcy Rule 8009 allows for an initial brief and reply brief and provides that "[n]o further briefs may be filed except with leave of the district court." The trustee should have filed a motion seeking leave to file a sur-reply, but the court declines to strike Section IV because the trustee's citations are helpful in reviewing the record and addressing the appellants' assertions that the trustee's counsel requested a limitation of the valuation evidence.

*B. Trustee's LBO Theory*

The court turns to whether the asset sale should be treated as an LBO and collapsed. Most courts applying an LBO theory have done so with respect to stock sale transactions, not asset sale transactions. In a typical leveraged buyout sale, the buyer purchases the shares of the debtor corporation by encumbering all or most of its assets. As a result, the debtor's assets can no longer be used to pay creditors. The corporation gets nothing in exchange for the encumbrance of its assets; instead all of the money goes to the selling shareholders. Shareholders try to claim protections of § 550(b) of the Bankruptcy Code contending that they were subsequent transferees who took for value, in good faith, and without knowledge of the voidability of the transfer avoided. In response, some courts have collapsed the steps of an LBO. When these LBOs are collapsed, courts treat the entire LBO as if the lender directly transferred the funds to the selling shareholders; the shareholders then become initial transferees and lose their § 550(b) affirmative defense. Collapsing also means that the company received no value from the transaction because the money goes straight through to the shareholders and the corporation merely obtains new ownership.

The trustee argues that although this was an asset sale transaction, all the hallmarks of a leveraged buyout transaction were present. He asserts that the sale was a transfer of ownership that resulted in a severe over-leveraging of the company's assets and that the functional equivalent of the stock — i.e., ownership and control of the enterprise — was transferred. The trustee therefore asks the court to collapse the transaction and treat Crown Stock and Crown Unlimited as

one entity. Viewing the transaction as a mere transfer of ownership, the trustee argues that the company received no value for the encumbrance of its assets. He points out that Mr. Smith created a shell corporation to purchase Crown Stock that had no assets beyond the $500 capital infusion, this shell corporation procured a $3.1 million loan secured by the assets of Crown Unlimited, the $3.1 million passed through Crown Stock directly to the shareholders, the $2.9 million note further encumbered Crown Unlimited's assets, and F&M and the appellants were looking directly towards Crown Unlimited's future earnings and proceeds as the source of repayment. The trustee further points out that the goal of the transaction was for Mr. Smith to acquire Crown Unlimited and continue to run it as a going concern and that Crown Unlimited was effectively the same company before and after closing; it had the same assets, the same business, the same location and the same employees as Crown Stock. The trustee asserts that for third parties, Crown Unlimited was the same business. Even though this was technically an asset sale, the trustee urges the court to consider substance over form.

The bankruptcy court disagreed with the trustee, finding that the trustee's approach "inaccurately characterizes what transpired, overlooks significant facts and would operate to deprive the individual defendants of the defenses that § 550(b) gives to subsequent transferees." (Decision, p. 6). Finding that this was an asset purchase sale between two separate entities, the bankruptcy court reasoned that it didn't have the hallmarks of an LBO because although the debtor "ended

up burdened with a significant amount of debt as a result of the sale, it also received the benefits of that sale — the assets purchased were transferred to it, not to someone else." (Decision, p. 6).

The court agrees with the trustee that substance over form should control and that an asset sale can be characterized as an LBO and collapsed in some circumstances, *see* <u>Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)</u>, 321 B.R. 128, 133 (Bankr. D. Del. 2005), but such circumstances don't exist here. As noted in <u>In re OODC</u>, "the issue is not whether there was common ownership on both sides of the transaction or whether the transfer was a stock or an asset sale, but rather whether there was an overall scheme to defraud the estate and its creditors by depleting all the assets through the use of a leveraged buyout." 321 B.R. at 138 (finding that the trustee's allegations that the entire series of asset purchases and transfer of funds was orchestrated by the defendants with the intent to defraud the debtor and its creditors, if proven, was sufficient to collapse the transactions).

The bankruptcy court found that the shareholders (other than Mr. Stroup II) acted in good faith and had no knowledge of the voidability of the transactions. The bankruptcy court found that although Crown Stock and Mr. Stroup II weren't good faith transferees, they didn't set out to defraud the debtor and weren't guilt of any conspicuous deception. The sale didn't occur between insiders and neither party occupied a fiduciary or "special" relationship to the other. The debtor purchased a separate entity's assets and although it continued the business as a going concern, the evidence shows no overall scheme to defraud, or attempt to

actively hide the transaction from creditors, or plan to evade the company's obligations. In fact, Crown Unlimited paid the liabilities it assumed within a few months of the sale and continued in operation for three and a half years. For these reasons, the court agrees with the bankruptcy court and finds that the transaction doesn't contain the hallmarks of an LBO and shouldn't be collapsed.

The trustee's alleged entitlement to the $590,000 dividend that Crown Stock paid to its shareholders is based upon his assertion that the transaction should be collapsed and Crown Stock and Crown Unlimited should be treated as one entity. The bankruptcy court found that when the dividend was paid, the money belonged to Crown Stock and not the debtor; the transfer therefore couldn't form the basis of a fraudulent transfer claim. Having affirmed the bankruptcy court's decision that the transaction shouldn't be collapsed, this court agrees that the trustee isn't entitled to recover the $590,000 dividend.

The court denies the trustee's claims on cross appeal and now considers the issues raised by the defendants.

### C. Trustee's Expert Valuation Evidence

The defendants contend that the trustee limited his theory at trial to the leverage buyout collapsing theory and correspondingly limited the purpose of his expert's testimony to support this theory. During opening statements the trustee stated:

> The valuation evidence . . . is being presented to establish that the company was insolvent on day one. It also is evidence that the company was undercapitalized. Now, while the evidence will show that the purchase price was too high, that is not the purpose of the valuation evidence itself. The inadequacy of consideration is not the point of the valuation evidence. . . .[I]n this case, the evidence will show that Defendants gave nothing at all to the company . . .

(Tr. Vol. 1, p. 23). The bankruptcy court, while rejecting the trustee's theory, entered judgment in his favor, finding that even though the debtor received value in the January 2000 transaction, it was less than reasonably equivalent value.

Citing Federal Rule of Evidence 105, the appellants argue that the trustee should have been limited to his counsel's statement that the testimony wasn't offered to show the value of assets and shouldn't have been considered by the bankruptcy court when determining the value of the company. The trustee responds that Rule 105 is limited to jury trials and that in any event, he never asked the judge to limit the evidence. The trustee points out that in opening statements, he also stated: "We will present evidence on the value of this business. Our experts will testify as to a value, in their opinion, three point two to three point three million." (Tr. Vol. 1, p. 22).

Rule 105 provides that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Authorities have reasoned that this rule shouldn't be restricted to jury trials. 21A WRIGHT & GRAHAM, *Federal Practice & Procedure*, § 5063.1, at 269 (2d ed. 2005) ("Rule 105, though it speaks of

instructing 'the jury' applies in nonjury trials as well."). Further, the proponent can request limitation even though not obliged to do so by Rule 105. The proponent "will only do this when the proffered evidence can bite back if not limited." 21A WRIGHT & GRAHAM, *Federal Practice & Procedure*, § 5065, at 333 (footnotes omitted).

Still, Rule 105 doesn't apply here because the trustee didn't specifically ask the judge to limit his evidence, the appellants' counsel never asked that the evidence be limited, and the evidence isn't otherwise inadmissable to show valuation. "Though few cases discuss this requirement in any but general terms, the writers agree that a request for limitation must be specific." 21A WRIGHT & GRAHAM, *Federal Practice & Procedure*, § 5065, at 332 (footnotes omitted); *see also* United States v. Thirion, 813 F.2d 146, 155 (8th Cir.1987); United States v. Smith, 459 F.3d 1276, 1279 (11th Cir. 2006). Had the appellants wanted to limit the evidence, they should have sought clarification of the status of the evidence or requested that the evidence be limited. 21A WRIGHT & GRAHAM, *Federal Practice & Procedure*, § 5065, at 328-330; *see also* Bucher v. Krause, 200 F.2d 576, 584 (7th Cir. 1953) (finding that evidence which was allegedly admissible only for limited purpose was properly admitted over defendants' general objection; it was the defendants' obligation to request a limitation if they so desired); United States v. Smith, 283 F.2d 760, 763 (2nd Cir. 1960) (same); Wilson v. Merrell Dow Pharms. Inc., 893 F.2d 1149, 1153, n.5 (10th Cir.1990) ("Under Federal Rule of Evidence

105, the opponent of the evidence has the burden of requesting that a limiting instruction be given.").

The bankruptcy court didn't err when considering the trustee's expert valuation evidence to determine whether the debtor received less than reasonably equivalent value in the transaction.

### D. Indiana Code § 32-18-2-14

The bankruptcy court found that the defendants were liable pursuant to § 14(2) of Indiana's Uniform Fraudulent Transfer Act. IND. CODE § 32-18-2-14. To be liable under §14(2), Crown Unlimited must have made the transfer or incurred the obligation without receiving reasonably equivalent value and either was about to engage in a business for which the remaining assets were unreasonably small or reasonably should have believed that it would incur debts beyond its ability to pay.

The appellants contend that the bankruptcy court erred in finding that these elements were met. They first contend that the bankruptcy court committed reversible error by finding that the debtor didn't receive reasonably equivalent value in the January 2000 transaction. The trustee presented expert witness testimony that the value of the assets was $3,246,000. Based on this and other evidence presented, the bankruptcy court found that the assets were worth no more than $4 million. The court stated:

> Having considered the evidence presented to it, with due regard for the credibility of the witnesses who testified, their qualifications, background, experience, and expertise, as well as their valuation methods, the information they considered and had available to them, and the assumptions each expert made in formulating their respective opinion, the court finds that the fair market value of Crown Unlimited in January of 2000, at the time it was sold to the debtor, did not and could not have exceeded $4 million.

(Decision, p. 13). The court found that the $4 million wasn't reasonably equivalent to the $6 million purchase price.

The appellants argue that the bankruptcy court should have discounted the promissory note when determining the purchase price, because the note was essentially worthless and the appellants obtained only $200,000 in payments on the note. The purchase price then would be $3.3 million for a company worth $4 million. The appellants cite to Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.), 148 B.R. 97, 110 (Bankr. D. Mass. 1992), but that case is different from this case. The Morse Tool court determined the value of an undertaking that was contingent on the debtor's satisfaction of ERISA's minimum funding requirements. Id. at 153. The court found that "the Trustee has not sustained his burden of proving that [the debtor] was certain or even likely to default on its pension funding obligations, so the Court has valued the Undertaking liability at zero." Id. at 135, n. 39. The promissory note in this case wasn't contingent upon the happening of a future event.

The appellants also cite to Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer, 472 F.3d 943 (7th Cir. 2007), to support their argument that the note's

book value shouldn't be used to determine whether reasonably equivalent value was given in the allegedly fraudulent transfer. In <u>Jumer Castle Lodge v. Jumer</u>, the property transferred consisted of accounts receivable and the court had to determine their value in comparison to the consideration received. The court found that the accounts receivable should be valued at their fair market value, and that the case's factual circumstances were such that "no jury reasonably could find that the . . . account was worth its full book value." The court agrees with the trustee that <u>Jumer Castle Lodge v. Jumer</u> differs from our case. The <u>Jumer Castle Lodge</u> court addressed an asset's value; when the fraudulent conveyance involves the debtor's incurrence of an obligation that the creditor expected the debtor to honor, the analysis logically changes. <u>See</u> <u>Freeland v. Enodis Corp.</u>, 540 F.3d 721, 729-730 (7th Cir. 2008) (finding that promissory notes weren't contingent liabilities given that the debtor promised to pay sum certain on date certain; the court therefore included the full value of the notes in determining the debtors insolvency); *see also* <u>Lids Corp. v. Marathon Inves. Partners, L.P. (In re Lids Corp.)</u>, 281 B.R. 535, 545 (Bankr. D. Del. 2002) (when evaluating solvency in a § 547(f) dispute, the court stated that debts, unlike assets, "are measured at their face value and not at market value."). The transaction should be evaluated from the perspective of the debtor's creditors, not from the perspective of the defendant/transferee. <u>Frontier Bank v. Brown (In re Northern Merch., Inc.)</u>, 371 F.3d 1056, 1059 (9th Cir. 2004).

As the bankruptcy court found, the parties to the transaction behaved as if the promissory note created an absolute, not a contingent, liability. "It was entered as such on the debtor's balance sheet, the debtor honored its obligation to pay, at least for a while, and when it failed to do so Crown Stock was happy to initiate proceedings to enforce that obligation." (Decision, p. 13). The parties didn't discount the promissory note at the time of the transaction and the court shouldn't use hindsight to discount the notes now. *See* In re Calvillo, 263 B.R. 214, 219 (W.D. Tx. 2000).

Relying on Barnhill v. Johnson, 503 U.S. 393, 397-400 (1992), the appellants further argue that the court shouldn't have considered the note because it wasn't a "transfer." The Barnhill Court addressed the transfer of a check in the context of a preference payment and found that the transfer occurs on the date the check is honored. Section 547(b) (preferences) is designed to avoid "any transfer of an interest of the debtor in property . . . ." Section 14, on the other hand, voids "a transfer made or obligation incurred," and refers to "reasonably equivalent value in exchange for the transfer or obligation." Section 14 presents the issue of whether the debtor received reasonably equivalent value for the transfers made and the obligations incurred. Because §14 doesn't limit the court's review to "transfers made", this court must consider the obligations incurred on the promissory note as well. *See e.g.,* In re Fidelity Bond and Mortg. Co., 340 B.R. 266, 285-286 (Bkrtcy. E.D. Pa. 2006).

The court valued Crown Unlimited at $4 million at the time of transfer; the debtor paid $6 million. Taking several factors into consideration, the bankruptcy court found that the debtor didn't receive reasonably equivalent value for the sale. That finding isn't clearly erroneous.

The appellants next argue that even if the debtor didn't receive reasonably equivalent value, the bankruptcy court erred by determining that the debtor's remaining assets were unreasonably small in relation to the business. Having unreasonably small assets is a financial condition just short of insolvency, whether balance sheet or equitable, but which is likely to eventually lead to insolvency. Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.), 100 B.R. 127, 137 (Bankr. D. Mass. 1989). Courts examine "the ability of the debtor to generate enough cash from operations or asset sales to pay its debts and still sustain itself" after the transfer. In re Vadnais Lumber Supply, 100 B.R. at 137. The test requires analysis of the debtor's ability to generate sufficient cash flow from operations and the sale of assets to pay its debts and remain financially stable. In re C.F. Foods, L.P., 280 B.R. 103, 116 (Bankr. E.D. Pa. 2002); In re Vadnais Lumber Supply, 100 B.R. at 137. The analysis is "forward-looking, requiring consideration of liabilities the debtor would incur or contemplated transactions for which the remaining assets were unreasonably small." Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.), 360 B.R. 787, 870-871 (Bankr. N.D. Ill. 2007) (internal quotations omitted) (*quoting* Levit v. R. T. Milford Co. (In re Thunderdome Houston Ltd. P'ship), 2000 WL

889846, at *10 (Bankr. N.D. Ill. 2000)). The standard is reasonable foreseeability, requiring an objective assessment of the firm's financial projections at the time of the sale. In re Hyde Park, Inc., 360 B.R. at 870.

The appellants assert that they couldn't have had unreasonably small capital because Crown Unlimited operated for three and half years before declaring bankruptcy. The appellants cite to Daley v. Chang (In re Joy Recovery Tech. Corp.), 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002), for the proposition that "courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction." (citing the following cases: Moody v. Security Pacific Bus. Credit, 971 F.2d 1056, 1074 (3rd Cir.1992) (no unreasonably low capital where creditors paid for twelve months after transaction); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D. N.Y. 1995) (same where company was viable for eight months after LBO); In re Ohio Corrugating Company, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988) (same creditors paid for ten months); Credit Managers Ass'n of S. California v. Federal Co., 629 F. Supp. 175, 184 (C.D. Cal.1985) (twelve months)).

The bankruptcy court refused to find that the length of time the debtor operates is alone determinative of the issue. The bankruptcy court instead found that the reason "the Debtor survived as long as it did was through the financial equivalent of advanced life support." (Decision, p. 17). This court agrees with the bankruptcy court: the length of time a corporation survives is an important, but

not dispositive, factor. *See* <u>ASARCO LLC v. Americas Mining Corp.</u>, 396 B.R. 278, 398-399 (S.D. Tex. 2008) (noting that while this is an important factor, it is "merely one factor to consider in the unreasonably small assets analysis"[;] "that ASARCO did not file bankruptcy until over two years after the transfer is not dispositive."). The court in <u>In re Morse Tool</u>, 148 B.R. at 133-34, reasoned:

> The fact that Morse was able to remain afloat for over two years after the buyout does not establish that the buyout left Morse adequately capitalized to continue in business. That Morse would fail was almost certain from the start. Events that transpired after the buyout may have hastened Morse's collapse, but they came after Morse was already fatefully undercapitalized. The Court concludes that the buyout transactions left Morse with unreasonably small capital.

<u>In re Hyde Park, Inc.</u>, 360 B.R. at 870 (court held that debtor had unreasonably small capital despite three years of continued operation). The bankruptcy court considered the length of Crown Unlimited's operation, but as already explained, in light of the other evidence presented, found that this fact wasn't dispositive.

The bankruptcy court reasoned that even though the debtor's financial projections prepared before the sale indicated it was possible to successfully service the debt, those projections were unreasonable. "They were largely premised upon the debtor maintaining or exceeding record sales levels and did not adequately account for the fact that sales sometimes decline." (Decision, p. 17). The appellants contend that the bankruptcy court shouldn't have relied on the debtor's financial projections to determine that the debtor had less than adequate assets because Crown Stock and its shareholders never saw those projections. The

appellants cite no authority for the proposition that the transferee must know of the debtor's projections.

The appellants argue that the bankruptcy court also erred by finding that an "excessive purchase price,"rather than choices the debtor made after the January 2000 transaction, caused the financial problems. They point out that the debtor only paid $200,000 toward the $2.9 million note during the three years it operated the business. They also note that the debtor began incurring warranty costs of $82,000 that weren't assumed, waited a year before getting a line of credit needed to fund operating expenses in 2000, focused too heavily on standardized equipment, began holding too much inventory, engaged in too much discretionary spending, and made other decisions that negatively affected the company's profitability. The appellants further contend that the economic recession following 9/11 adversely impacted the business.

There was, however, evidence that pointed in the other direction. Before the sale, Mr. Smith's accountant questioned the viability of the company at a purchase price greater than $6 million and told Mr. Smith that he was concerned about the company's lack of working capital. At trial, expert witnesses for both the plaintiff and the defendants testified that the debtor had a working capital deficient after the sale. The debtor assumed liabilities of some $1.5 million and took on annual debt service obligations to F&M of approximately $495,000 and minimum annual payments of $100,000 on the promissory note — these minimum payments resulted in negative amortization. There was evidence that

Crown Unlimited's projections for success and payment of its debt were based largely upon it maintaining or exceeding record sales levels and didn't account for a decline or provide for difficulties that might arise. *See* <u>Moody v. Security Pacific Bus. Credit, Inc.</u>, 971 F.2d 1056, 1073 (3rd Cir. 1992) ("To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.").

Upon review of all the evidence, the bankruptcy court found that the business was doomed to failure and although Mr. Smith's management "may have had some impact upon [Crown Unlimited's] demise, the court is satisfied that the true cause of the debtor's financial problems was not what happened after the sale, but the excessive purchase price paid to acquire the business and the debt associated with it." (Decision, p. 17). Based on the evidence presented, the bankruptcy court's finding that the purchase price left the debtor with unreasonably small assets isn't clearly erroneous.

The court affirms the bankruptcy court's finding that the transfer was fraudulent within the meaning of § 14.


*E. Qualifying Creditor - Indiana Code § 32-18-2-15*

The appellants next contend that the trustee didn't have standing to bring a claim pursuant to §15 of Indiana's UFTA because the trustee can't identify a qualifying creditor — one that was in existence at the time of the January 2000

transaction. *See* IND. CODE § 32-18-2-15. The parties don't dispute the existence of creditors that give the trustee standing to bring a claim pursuant to § 14. Because the bankruptcy court wasn't clearly erroneous in finding for the trustee on § 14 liability, this court needn't review the trustee's claim of § 15 liability.


## F. Good Faith Transferee Defense

The appellants claim entitlement to the good faith transferee defense found in § 550(b) of the Bankruptcy Code, 11 U.S.C. § 550(b), and § 18 of Indiana's UFTA, IND. CODE § 32-18-2-18(b). Section 550(b) provides that a trustee may not recover an avoided transfer from an immediate transferee who takes for value, in good faith, and without knowledge of the voidability of the transfer avoided. Crown Stock was the initial transferee of the $3.3. million; the individual defendants were immediate or mediate transferees.

The bankruptcy court found that Mr. Stroup II wasn't a good faith transferee because he had more than sufficient knowledge of the sale's potentially fraudulent nature. But this wasn't so with the remaining individual appellants, Mr. Stroup Sr., Loretta Stroup, Clayburn Stroup and Donald Houseworth. The bankruptcy court found that they acted in good faith without knowledge of the voidability of the transfer. The bankruptcy court reasoned that they "did not have [Mr. Stroup II's] high degree of involvement in the transaction or his knowledge of its details," and that aside from Mr. Stroup, Sr., it didn't appear that they were "much involved in the operation of the business." (Decision, pp. 25-26). Because

they had no reason to know of the possibly fraudulent nature of the transaction that resulted in the distributions they received, the bankruptcy court found that they had no duty to investigate further. *See* <u>Bonded Fin. Servs., Inc. v European Am. Bank</u>, 838 F.2d 890, 897-898 (7th Cir. 1988).

Although the individual appellants acted in good faith, the bankruptcy court found that they weren't entitled to the § 550(b) defense because they didn't prove that they took "for value." Value isn't defined for purposes of § 550, but is defined for purposes of § 548 (Bankruptcy Code fraudulent conveyance statute). Section 548 defines value as "property, or satisfaction or securing of an antecedent debt . . . ." 11 U.S.C. § 548(d)(2)(A). This is similar to the definition in the UFTA. *See* IND. CODE § 32-18-2-13(a). Courts have found that the term "value" in § 550(b) is different from reasonably equivalent value; "[a] natural reading looks to what the transferee gave up rather than what the debtor received." *See* <u>Bonded Fin. Servs., Inc. v European Am. Bank</u>, 838 F.2d at 897; *see also* 5 COLLIER ON BANKRUPTCY ¶ 550.03[1] (15th ed.). The value needn't be reasonably equivalent value; Section 550(b)(1) requires only "value." *See* 5 COLLIER ON BANKRUPTCY ¶ 550.03[1].

The bankruptcy court found that the individual defendants gave no value in exchange for the distributions they received from Crown Stock. The court reasoned that "[t]hose distributions were made, not in return for some exchange of property or services, or the payment of an antecedent debt, but solely on account of their status as shareholders in the company." (Decision, p. 26). The

appellants contend that the shareholders gave value when they voted in favor of selling the assets of Crown Stock and gave up their right to future profits from the use of those assets. But as the appellants stated, "[e]ven if they had known of and disagreed with the terms [of the sale], they could not have stopped the transaction from occurring as Stroup II held a majority interest in [Crown Stock]." (Appellants' Brief, p. 13). The shareholders' vote therefore wasn't necessary for the sale. Even if their vote was necessary, this was an intangible act; it wasn't the exchange of "property, or satisfaction or securing of an antecedent debt . . . ." as value is defined in the Code.

Further, it was Crown Stock, not the shareholders, who transferred assets to the debtor. Crown Stock made distributions to the shareholders after the sale in a separate transaction. It is that transaction the court must consider when determining if value was given. When asked what the shareholders gave in exchange for the proceeds, Mr. Stroup II testified that "[i]t was a liquidation thing. I'm not sure that it was necessary to give anything. The proceeds were distributed pro rata and the company was wrapped up." (Tr. V. 6, p. 157). The cash was distributed according to the shareholders' percentage of ownership in the company; they weren't required to give anything in exchange for the distribution. The distribution therefore wasn't "for value." *See e.g.,* Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Group), 916 F.2d 528, 540 (9th Cir. 1990) ("The partnership distributions here were not for value because Palms Seedlings-A made the distributions on account of the partnership interests and

not on account of debt or property transferred to the partnership in exchange for the distribution.").

The appellants next contend that Mr. Stroup Sr. gave value in exchange for his receipt of funds by singing a non-compete agreement. Even if the non-compete agreement constitutes value for the sale of assets to the debtor, it wasn't value for the distribution. Crown Stock sold its assets as a going concern for $6 million and as part of that transaction, Mr. Stroup Sr. and Mr. Stroup II signed non-compete agreements. If the non-compete agreement constitutes value, it is value for the initial transaction to the debtor. Mr. Stroup Sr. wouldn't be an immediate transferee in this situation. Crown Stock then distributed those proceeds to the shareholders in relation to their equity interest. It is that transaction that makes Mr. Stroup Sr. an immediate transferee and it is that transaction for which Mr. Stroup Sr. must show that he took for value. The noncompete agreement doesn't constitute value for the distribution.

Because appellants, Mr. Stroup Sr., Loretta Stroup, Clayburn Stroup and Donald Houseworth didn't take the distributions for value, they aren't afforded the protections of § 550(b).

The court next addresses whether the appellants are entitled to a reduction in judgment pursuant to § 18(d) of Indiana's UFTA. IND. CODE § 32-18-2-18(d). Unlike § 550(b) of the Bankruptcy Code, § 18 also applies to initial transferees such as Crown Stock. Indiana Code § 32-18-2-18(d) provides that a transferee or obligee that acts in good faith, is "entitled, to the extent of the value given the

debtor for the transfer or obligation, to: . . . a reduction in the amount of liability on the judgment." This court shares the bankruptcy court's reluctance to allow Crown Stock to raise a defense not found in § 550. Once a trustee demonstrates the right to avoid a transfer under state law, the trustee must turn to § 550 to determine the amount of recovery. *See* Joseph v. Madray (In re Brun), 360 B.R. 669, 672 (C.D. Cal. 2007) (*citing* Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 809 (9th Cir.1994)). For example, state law often limits the trustee's recovery to the amount owed the creditor whose rights were invoked, *see e.g.*, IND. CODE § 32-18-2-18(b); Section 550 cuts the trustee loose from this limitation and allows the trustee to recover the entire value of the property transferred, even if it exceeds the debt to the creditor that provided the basis for the action. *See* Barber v. Westbay (In re Integrated Agri, Inc.), 313 B.R. 419, 428 (Bankr. C.D. Ill. 2004); Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 809 (9th Cir. 1994).

While state law "governs whether and to what extent a transfer of property is voidable, the value of the avoided transfer, and therefore, the recovery is governed by § 550(a), irrespective of any recovery limitation imposed by [state] law." In re Brun, 360 B.R. at 675. Section 550 doesn't include a defense similar to Indiana Code § 32-18-2-18(d), but does provide a good faith transferee with "a lien on the property recovered to secure the lesser of . . . the cost . . . of any improvement made after the transfer" and the increase in the property's value "as a result of such improvements." 11 U.S.C. § 550(e). This court agrees with the

bankruptcy court that had Congress "wanted to give any further protection to a transferee as a result of what had been advanced[,] it could have easily done so." (Decision, pp. 21-22). While there are cases finding that a set off provision in a states' fraudulent conveyances laws should apply when those laws are invoked via 11 U.S.C. § 544(b), *see e.g.,* Decker v. Trammel (In re JTS Corp.), 2006 WL 2844581, *5 (N.D. Cal.), this court finds such cases unpersuasive. The court instead looks to § 550 to determine the extent of the trustee's recovery.

Even if Indiana Code § 32-18-2-18(d) were applicable, Crown Stock is precluded from recovery under that section because it acted without good faith. The bankruptcy court found that Crown Stock's president and majority shareholder, Mr. Stroup II, wasn't a good faith transferee because he had sufficient knowledge of the potentially fraudulent nature of the sale to place him on inquiry notice. *See* Uniform Fraudulent Transfer Act § 8, comment 2 ("Knowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee."). Failure to investigate under circumstances that would cause a reasonable person to investigate can show lack of good faith. Bonded Fin. Servs., Inc. v European Am. Bank, 838 F.2d at 897-898 ("Venerable authority has it that the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate."). Mr. Stroup II engaged in negotiations with Mr. Smith; it was Mr. Stroup II and Mr. Smith who agreed on the $6 million purchase price. Mr. Stroup II was aware that there was an independent appraisal obtained

in 1994 valuing the company at $1.2 million. The appraisal provided a twenty percent annual increase in sales to determine a value of $2.5 in 1998. The bankruptcy court noted that this might have been a rough estimate, but found that there was no justification for an increase of value to $6 million by 1999. The bankruptcy court concluded that Mr. Stroup II "had no reason to believe that the company was worth $6 million." (Decision, p. 23). Mr. Stroup II was also aware that the debtor needed to finance a significant amount of the purchase price. There were sufficient facts to support the bankruptcy court's finding that Crown Stock wasn't a good faith transferee.

### G. Limitation on Recovery under Section 550(a)

The appellants contend that the proper recovery under § 550 of the Bankruptcy Code is the property's market value at the time of transfer, less the consideration received. The appellants properly note that § 550(a) is intended to restore the estate to the financial condition it would have enjoyed had the transfer had not occurred. Morris v. Kansas Drywall Supply Company, Inc. (In re Classic Drywall, Inc.), 127 B.R. 874, 876 (D. Kan.1991). The appellants argue that the estate is effectively restored by cancelling the note: the debtor paid $3.3 million for assets worth approximately $4 million. Without a setoff, the trustee gets $4 million in assets and an additional $3.3 million recovery. The appellants contend that this constitutes an impermissible windfall, citing to Hirsch v. Steinberg (In re Colonial Realty Co.), 226 B.R. 513, 525-526 (Bankr. D. Conn.1998) for support.

The In re Colonial Realty court stated that "[c]ourts generally agree that the market value of the property at the time of transfer, less the consideration received, is the proper measure of recovery under § 550." 226 B.R. at 525 (claim brought pursuant to § 548); *see also* Shape, Inc. v. Midwest Eng'g, Inc. (In re Shape, Inc.), 176 B.R. 1, 3 (Bkrtcy. D. Maine 1994) (claim brought pursuant to § 548); In re CNB Intern., Inc., 393 B.R. 306, 332 (Bkrtcy. W.D. N.Y. 2008) (claim brought under state law pursuant to § 544). Further, the appellants point out that § 550(d) limits the recovery authorized by § 550(a) by restricting the trustee to a "single satisfaction".

To read this limitation of recovery into § 550(a) would render § 548(c) effectively moot. If defendants had an unqualified right to a set off in § 550(a) against the value of the property exchanged, § 548(c) would be superfluous. Section 548(c) provides that "[e]xcept to the extent that a transfer . . . is voidable under section 544, 545, or 547 . . ., a transferee . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . ., to the extent that such transferee . . . gave value to the debtor in exchange for such transfer . . . ." 11 U.S.C. § 548(c). Section 550(a) states that "to the extent that a transfer is avoided under section . . . 547, . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . . ." 11 U.S.C. § 550(a). The language of § 550 doesn't provide a right of setoff for the value of property exchanged in the transaction. The appellants cite to Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1196 (7th Cir. 1989), to

support their claim of set off, but that case involved a preference payment pursuant to § 547, which contemplates avoiding only part of a transfer when, for example, a transfer is supported by contemporaneous new value. That case is inapplicable when a trustee brings his claim pursuant to § 544.

Further, the court has already determined that the individual appellants didn't provide value for their distribution. Since they didn't provide value, they wouldn't be entitled to a set off. Crown Stock provided consideration for the transfer, but didn't act as a good faith transferee. In <u>Aalfs v. Wirum (In re Straightline Invs., Inc.)</u>, 525 F.3d 870, 884 (9th Cir.2008), the Ninth Circuit noted that even if the recovery constituted a windfall, "requiring the return of the wrongfully-transferred property to the estate was the proper course of action where the debtor had a greater equitable claim to the property than did the transferee." (*citing* <u>In re Acequia</u>, 34 F.3d at 812). The court reasoned that "[a]lthough the bankruptcy court's judgment may allow the Debtor's estate theoretically to remain $186,455 ahead of where it would have been in the absence of any transfer, the estate has a greater equitable claim than does [the transferee]." <u>In re Straightline Invs., Inc.</u>, 525 F.3d at 884. The reasoning in <u>In re Straightline Invs.</u> is persuasive; the court finds that the trustee's recovery isn't limited by the value of assets transferred.

*H. Impermissible Double Recovery*

The appellants contend that the trustee received an impermissible double recovery as a result of amounts paid by F&M into the estate. During the bankruptcy, the debtor petitioned the court to authorize the sale of assets; the court approved the sale and the assets were sold to Crown Acquisition for $3.7 million. F&M financed the sale of the assets with a new loan guaranteed by Mr. Smith. F&M then entered into a settlement agreeing to return $100,000 to the debtor's estate from the purchase price of the sale to Crown Acquisition and also agreed to pay the trustee's counsel $50,000 to be applied toward prosecution of a fraudulent conveyance action against the defendants. F&M agreed that the sale of assets would satisfy all of the debtor's obligations owed to F&M.

The appellants seek a credit for the Section 363 sale of assets that were used to pay off the F&M financing. The appellants cite no authority for this proposition, and the court finds none. F&M's settlement was related to an independent lending transaction and as such, doesn't constitute an impressible double recovery for purposes of the trustee's fraudulent conveyance action.


IV. Conclusion

For the reasons set forth above, the bankruptcy court's decision is affirmed.

SO ORDERED.

ENTERED:   February 17, 2009


  /s/ Robert L. Miller, Jr.
Chief Judge

United States District Court

cc:    Hon. Robert E. Grant